JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3882 | **DATE** | 3/8/2002 |
| **CASE TITLE** | Kathryn Kaniff vs. United States | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion in limine to bar certain testimony of David Price (Doc. No. 84-1) is denied as moot. Plaintiff's motion for directed verdict on the issue of the x-ray (Doc. No. 95-1) and probable cause required for hospital detention (Doc. No. 95-2) also denied. Plaintiff's motion to strike Defendant's proposed findings of fact and conclusions of law (Doc. No. 100-1) is denied as moot. Judgment is entered in favor of the United States.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | *1* number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 11 2002 date docketed | 111 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | CDY docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 3/8/2002 date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 MAR -8 PH 2: 50 Date/time received in central Clerk's Office FILED | ETV mailing deputy initials | |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATHRYN KANIFF,       )
                             )
           Plaintiff,      )
                             )
          v.             )     No. 99 C 3882
                             )
UNITED STATES,         )     Judge Rebecca R. Pallmeyer
                             )
          Defendant.     )

## MEMORANDUM OPINION AND ORDER

Upon her return to the United States from a four-day vacation in Jamaica in December 1997, Plaintiff Kathryn Kaniff was strip-searched by United States Customs inspectors at O'Hare Airport in Chicago, and then taken to a nearby hospital for an x-ray of her abdomen. The inspectors did not discover any contraband on Plaintiff's person, nor in her luggage. Plaintiff was in the custody of Customs inspectors for a total of approximately four hours. She filed this action against the United States pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 2671 *et seq.*, for intentional infliction of emotional distress and false imprisonment.[1]

---

[1]      Plaintiff brought these claims pursuant to the Federal Tort Claims Act, ("FTCA"). The United States notes that its waiver of sovereign immunity under the FTCA, 28 U.S.C. § 2671, does not extend to any discretionary actions of the Customs inspectors in this case. 28 U.S.C. § 2680(a); (Defendant's Proposed Findings of Fact and Conclusions of Law at 19-20.) On November 21, 2001, Plaintiff moved to strike that portion of Defendant's Proposed Findings of Fact and Conclusions of Law relating to the discretionary function exception. In its response to that motion, Defendant explained that it raised the discretionary function exception because, "if this court finds that Customs had a particularized and objective basis for suspicion, it may not award plaintiff damages on a theory which would involve second-guessing discretionary decisions by the Customs inspectors which were predicated on their

(continued...)

## FACTUAL BACKGROUND

In August 2001, this case was tried before an advisory jury which returned a verdict for the Plaintiff. The court is not bound by an advisory jury's verdict, however. *Price v. Marshall Erdman and Assocs., Inc.*, 966 F.2d 320, 324 (7th Cir. 1992). As explained below, the court respectfully declines to follow the advisory jury's verdict here. What follows are the court's own findings of fact.

On December 28, 1997, Plaintiff returned from a four-day trip to Jamaica, arriving at O'Hare Airport at approximately 4:20 p.m. (Plaintiff's Proposed Findings of Fact and Conclusions of Law (hereinafter, "P.F.") at 2; Defendant's Proposed Findings of Fact and Conclusions of Law (hereinafter, "D.F.") at 1.) Prior to Plaintiff's arrival at O'Hare, Customs agents' attention was already drawn to her because of information obtained from the passenger analysis unit (PAU), a device that screens

---

[1](...continued)

reasonable suspicion." (Defendant's Response to Plaintiff's Motion to Strike at 3-4.) The court is puzzled by Defendant's explanation for having raised this issue. Defendant's response to the motion to strike suggests that if the exception applies, this court does not have subject matter jurisdiction, a matter far more significant than the amount of damages this court may award. The court concludes, however, that Defendant does not seriously challenge this court's jurisdiction: consider the late date (*after* the trial), Defendant raised the issue, and that, in clarifying its motives, Defendant concedes that the point was brought up in an attempt to limit avenues by which this court could award damages. Furthermore, in light of other cases decided in the federal courts involving the same allegedly discretionary decisions made by customs inspectors, the court finds no basis to question its jurisdiction here. *See e.g., Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (United States conceded at oral argument that plaintiff successfully stated claims of false imprisonment, invasion of privacy and negligence with respect to the actions of Customs inspectors, and the court concluded that the discretionary function exception did not apply). Plaintiff's motion to strike (Doc. No. 100-1) is denied as moot.

available information about incoming passengers to identify individuals whose travel circumstances indicate they may pose a higher risk than others of smuggling drugs. (D.F. at 2.) For example, the PAU collects information about the length of the passenger's travel and method of ticket purchase, and also provides access to various law enforcement databases. (D.F. at 3.) Customs inspectors review information provided by the PAU, and are then able to refer certain passengers for questioning upon their arrival in the United States. (D.F. at 3.) A witness for the Plaintiff explained that the PAU inspector refers a passenger for questioning by entering a "lookout" into the Customs database, which will be seen by other Customs inspectors when they review information about passengers as they arrive and pass through Customs' checkpoints. (D.F. at 3.)

On December 28, 1997, Inspector Guadalupe Whyte worked the PAU before Plaintiff's flight arrived. (D.F. at 3.) Whyte created a "lookout" requesting that Plaintiff be referred for questioning once she arrived in the United States. (D.F. at 3.) At trial, Whyte testified that she could not specifically recall all of the factors that led her to create the lookout, but at least some of them were: Whyte knew that, in 1997, Jamaica was both a source and transit country for drug trafficking and that there was a trend for drug smugglers from Jamaica to transport narcotics internally; Whyte observed inconsistencies between a Wisconsin address listed on Plaintiff's driver's license and the Chicago address Plaintiff had given the airline; and Whyte ran a query on Plaintiff's Chicago address and learned that heroin seizures and arrests had taken place at that building the previous year. (D.F. at 3-4.)

As she disembarked from the airplane, Plaintiff encountered Customs inspector Olga Martinez and handed Martinez her passport and declaration card. (P.F. at 3.) According to Plaintiff, Martinez wrote "PAT" on Plaintiff's declaration card, tracing over the letters several times.[2] (P.F. at 3.) Plaintiff testified that a male inspector, who had been standing with Martinez, walked up the hallway to canine enforcement officer Brian Yates. (P.F. at 4.) Plaintiff then inquired of Martinez what "PAT" meant, and Martinez responded that it meant nothing. (P.F. at 4.)

As Plaintiff proceeded away from Martinez, towards the jetway exit, she walked past Officer Yates and his drug detection dog, Shadow. (P.F. at 4; D.F. at 5.) Shadow "alerted" to Plaintiff: the dog pulled away from Officer Yates as Plaintiff passed by and began to "work the air" behind and around her. (P.F. at 5.) Officer Yates told Plaintiff to stop, and Shadow moved from side to side behind Plaintiff, circled around her, and finally stopped in front of her. (P.F. at 4; D.F. at 5.) Plaintiff asserts that Shadow seemed to be interested in the cardboard box she was carrying, which contained salt fish, banana bread and akee (a vegetable grown in Jamaica). (P.F. at 4.) Although Shadow stopped in front of Plaintiff, Officer Yates "praised off" Shadow before Shadow could respond by sitting down. Officer Yates explained that Shadow is trained to respond by sitting down after an alert, at which point the handler rewards him; but to ensure that Shadow was not rewarded for a "false positive" Officer Yates' practice was

---

[2]    The record does not explain whether the letters "PAT" that Martinez wrote on Plaintiff's declaration card was related to the PAU "lookout" Whyte had established .

to intervene to prevent Shadow from responding in this way in any situation when Officer Yates would not be able to promptly verify the presence of narcotics or a narcotics odor. (D.F. at 5.) Officer Yates advised Martinez of Shadow's "alert" to the presence of a narcotics odor so that, according to Customs Service's routine practice, Plaintiff would be referred for a secondary exam.[3] (D.F. at 6.) In a secondary exam, Customs officers conduct further document review and questioning, and usually, a baggage search and a pat-down search of the passenger's body as well. (D.F. at 6.) 18 days

Officer Yates and Plaintiff retrieved her backpack from the baggage claim area and then proceeded to Customs Secondary Inspection area. (P.F. at 5; D.F. at 7.) As Officer Yates and Martinez thoroughly searched Plaintiff's backpack and cardboard box of food, Martinez questioned Plaintiff about the circumstances of her travel. (P.F. at 5; D.F. at 7.) Martinez asked Plaintiff where she had stayed while in Jamaica. (P.F. at 6; D.F. at 9.) Plaintiff responded that she had stayed at the Silver Point Resort. (P.F. at 6; D.F. at 9.) Martinez asked what the Silver Point Resort was and whether Plaintiff had a receipt for her stay there. (P.F. at 6; D.F. at 9.) Plaintiff explained that she did not have a receipt and that the Silver Point Resort was a campground, which she further described as "Miss Linette's place and, basically, it is her backyard." (P.F. at 6; D.F. at 9.) Martinez and Plaintiff characterize this exchange differently.

---

[3]     At trial, Martinez testified that she did not recall having met Plaintiff until this point, when Officer Yates approached Martinez with Plaintiff; Martinez did not recall having met Plaintiff as she disembarked from the plane. (D.F. at 7.)

According to Plaintiff, Martinez repeatedly cut off Plaintiff's efforts to respond to the questions. (P.F. at 6.) Martinez, on the other hand, denied cutting off Plaintiff's answers. She testified that her questions were designed to get the Plaintiff talking about her trip and that her practice was to be attentive to the information offered, or not offered, in the answers. (P.F. at 7.) Officer Yates, who was present during this exchange, confirmed that Martinez did not interrupt Plaintiff, and further testified that Plaintiff appeared to be confused and had difficulty answering simple questions. (D.F. at 7.)

Plaintiff told Martinez that she was traveling alone, for pleasure, and was not visiting family or friends. (D.F. at 8.) When Martinez asked Plaintiff about her employment, Plaintiff responded that she was self-employed as a hair stylist, and that she used to own a shop, but had recently closed it and now cut hair in her clients' homes. (P.F. at 6.) She estimated that her annual income was between $9,000 and $11,000. (D.F. at 9.) Martinez asked Plaintiff how much money she was carrying with her, and Plaintiff said she had about six dollars. (D.F. at 8.)

Plaintiff told Martinez that she had paid for her airplane ticket with cash at a price of $624.99. (D.F. at 8.) There was conflicting evidence about the exact timing of Plaintiff's ticket purchase, and about what Plaintiff told Martinez during this secondary examination with respect to her ticket purchase: Martinez testified that Plaintiff showed her a document indicating that Plaintiff had purchased her ticket at the ticket counter just two days before her departure, and Plaintiff testified first that she had decided to go to Jamaica just 4 to 6 days before leaving, and later that she had

purchased the ticket almost two weeks in advance. (D.F. at 8.) It is undisputed that Plaintiff actually purchased her ticket on December 11, 1997, thirteen days prior to travel; she purchased the ticket, issued through Apple Vacations, from Vacation Hotline. (P.F. at 7; D. F. at 8.) Whether Martinez was under the impression that Plaintiff purchased her ticket just a few days, or thirteen days, prior to traveling to Jamaica, it is clear that Martinez knew Plaintiff had paid cash for a ticket on sufficiently short notice that she paid a premium for it: round trip tickets to Jamaica at this time were commonly available for between $200 and $300 if purchased more than two weeks in advance. (P.F. at 7; D.F. at 8-9.)

Martinez also asked Plaintiff where she lived and how she planned to get home from the airport. (P.F. at 6-7; D.F. at 9.) Plaintiff stated that her address was 4880 North Marine Drive in Chicago; her driver's license showed a Wisconsin address, general delivery on Washington Island. (D.F. at 9.) She additionally told Martinez that her friend Michael would come pick her up at the airport and take her home once she paged him. (P.F. at 6-7; D.F. at 9.) Martinez did not ask, nor did Plaintiff offer, Michael's last name, but when Martinez asked where he lived, Plaintiff responded that she did not know. (P.F. at 6-7; D.F. at 9.) During the course of this round of questions, Customs inspectors conducted a search of Plaintiff's baggage, but did not discover any narcotics.

After questioning Plaintiff, Martinez requested and received approval from her supervisor, Marc Woods, to conduct a pat-down search of Plaintiff. (D.F. at 10.) Pursuant to standard Customs procedure, Woods assigned Inspector Guadalupe Whyte

to be present as a witness for the search. (D.F. at 10.) Whyte then appeared in the Customs Secondary Inspection area and instructed Plaintiff to accompany her. (P.F. at 7; D.F. at 10.)

## The Pat-Down and Partial Strip Search

Whyte and Martinez led Plaintiff to a private search room, and closed the door behind them. (P.F. at 7; D.F. at 10.) Upon request, Plaintiff took off her shoes for the agents to inspect, but the agents did not find any contraband in them. (P.F. at 7.) Martinez next directed Plaintiff to stand against the wall with her arms and legs spread wide so that Martinez could conduct a routine pat-down search. (P.F. at 7; D.F. at 10.) According to Plaintiff, at one point during the pat-down, Martinez pushed upward roughly under Plaintiff's left breast. (P.F. at 7-8.) In reaction to the pain this caused, Plaintiff testified that her left arm slipped from the wall and that Martinez threatened that if she moved again, Martinez would push her into the wall. (P.F. at 8.) Both Whyte and Martinez deny that any threats were made. (D.F. at 11.) Martinez testified that during the pat-down, Martinez felt a lump or something thick in Plaintiff's crotch area. (P.F. at 8; D.F. at 11.) Martinez told Plaintiff that she felt something, and asked Plaintiff whether she was menstruating and whether she was wearing a pad. (P.F. at 8; D.F. at 11.) Plaintiff answered both questions in the negative. (P.F. at 8; D.F. at 11.)

Martinez testified that she was concerned that what she felt might have been contraband hidden in the crotch of Plaintiff's pants or inserted into, and partially protruding from, a body cavity. (P.F. at 7; D.F. at 11.) While Whyte remained in the

8

room to watch Plaintiff in the event she should try to remove or conceal any contraband, Martinez requested and obtained approval from Woods, her supervisor, to conduct a partial strip search to investigate what she felt during the pat-down search. (D.F. at 11.) Martinez returned to the private search room where Whyte and Plaintiff were waiting, and asked Plaintiff to take down her pants. (P.F. at 8; D.F. at 12.) Martinez and Whyte saw that Plaintiff was not wearing a pad, and saw nothing else that would explain what Martinez reported having felt. (P.F. at 8; D.F. at 12.) Martinez next asked Plaintiff to bend over at the waist and spread her buttocks. (P.F. at 9; D.F. at 12.) Plaintiff claims that the inspectors told her they needed to "see inside her vagina." (P.F. at 9.) Both Whyte and Martinez deny making this remark. (D.F. at 12.) Plaintiff complied; the inspectors visually inspected her, but saw no contraband, and did not touch Plaintiff. (P.F. at 9; D.F. at 12.) At the conclusion of this strip search, Plaintiff testified that Martinez and Whyte smirked at her, an allegation both inspectors deny. (P.F. at 9; D.F. at 12.)

Martinez and Whyte consulted with Woods, their supervisor, to determine what to do next. (D.F. at 12.) At this time, the three inspectors discussed information Whyte had obtained from a query she had run earlier on Plaintiff's address, specifically, that heroin seizures and arrests had taken place at this building the previous year. (D.F. at 4, 12.) Plaintiff testified that at some point while the three inspectors were talking, she heard Woods say, "Who is going to take the heat for this one?" (P.F. at 10.) One of the inspectors, though it is not clear which one, asked Plaintiff about the building she lived in, and Plaintiff advised them that her Marine

Drive address was a condominium she had purchased the previous June. (D.F. at 12.) When the inspectors asked her how she had bought the condominium, Plaintiff replied that she "knew this was going to come up" and that she "had a feeling this was going to come up." (D.F. at 13.) Plaintiff then explained that her brother had been killed in a plane crash. (D.F. at 13.) Plaintiff did not share with Martinez, Whyte, and Woods what she later told the jury: that her brother's 1995 plane crash was caused by pilot error, and that she purchased her condominium with money she received from the resulting wrongful death settlement. (P.F. at 2.)

Woods next told Plaintiff that he suspected she might be smuggling narcotics internally, and that she had three choices about how to proceed: first, to remain in custody until she had a monitored bowel movement, which might take several hours or days; second, to take a laxative, which would result in a bowel movement, but might be painful; or third, to go to the hospital for an x-ray exam. (P.F. at 10; D.F. at 13.) Woods also informed Plaintiff that she had the right to refuse to consent to the x-ray. (D.F. at 13.) Woods, Whyte, and Martinez each testified that Plaintiff consented to an x-ray, and Martinez and Whyte both testified that they were present to witness Kaniff sign a written consent form. (D.F. at 13.) Plaintiff is non-committal with respect to this consent issue: she asserts that she does not know if she signed a consent form, but acknowledges that she signed several papers while in custody. (P.F. at 10.) Under cross-examination, Plaintiff admitted that she understood that the form she signed

would allow her to be taken to the hospital for an x-ray.[4] (D.F. at 14.) She now characterizes any consent she might have given, however, as "not knowing and voluntary." (P.F. at 10.)

In the meantime, Woods consulted over the telephone with Chief Inspector Sergei Hotecko, telling him about the dog alert, the circumstances of Plaintiff's travel to Jamaica, and the answers she gave during questioning. (D.F. at 14.) Hotecko agreed with Woods that there was a reasonable basis to suspect that Plaintiff might be smuggling narcotics internally, and authorized Woods to go forward with the x-ray. (D.F. at 14.) Martinez cuffed Plaintiff's hands behind her back in accordance with routine Customs procedure, and as Plaintiff described it, "paraded [her] through a public portion of the international terminal at O'Hare airport." (P.F. at 11; D.F. at 14.)

Upon arrival at Resurrection Medical Center, the Customs inspectors provided a copy of Plaintiff's signed consent form to the hospital as required by hospital policy prior to performing an x-ray. (D.F. at 14.) The hospital also requires females to test negative on a pregnancy test before they are x-rayed; Martinez and Whyte accompanied Plaintiff to the bathroom so Plaintiff could provide a urine specimen for the pregnancy exam, which turned out negative. (P.F. at 11; D.F. at 14.) Plaintiff then submitted to the x-ray examination, which did not reveal the presence of any

---

[4]     The United States, though unable to produce the original consent form Plaintiff signed because Customs lost its file, did produce a copy of the consent form maintained by Resurrection Medical Center. (D.F. at 13.) This copy was poor, however, and while Whyte's and Martinez's signatures were legible, Plaintiff's signature was not. (D.F. at 13.)

contraband. (P.F. at 12; D.F. at 15.) Plaintiff testified that, as the Customs inspectors looked at her x-ray, she stood up from the chair she was waiting in and asked, in sarcastic anger, "So did you find the kilo? I'm going to get dressed now." The inspectors then took Plaintiff back to O'Hare so she could collect her belongings and go home. (P.F. at 12; D.F. at 15.)

According to Plaintiff, "immediately after the incident at O'Hare, [she] began to have recurring nightmares and flashbacks" and "would also wake up in the middle of the night in sweats and generally slept poorly." (P.F. at 12.) Plaintiff further alleges that she became paranoid, anxious, fearful of leaving her apartment, fearful of retaliation from someone at Customs, and has had trouble concentrating.[5] (P.F. at 12-14.) In the months following the O'Hare incident, Plaintiff claims to have distanced herself from her family, friends and clientele; she alleges that before the incident, she initiated outings with friends, engaged in romantic and sexual relationships with men, exercised, and returned clients' phone calls, but has done none of those things since the incident. (P.F. at 12-13.)

At trial, Plaintiff presented testimony from a psychiatrist, Dr. Gilbert Hefter, who testified that Plaintiff suffers from post-traumatic stress disorder as a result of the border search, that she is depressed, and that she has difficulty in relationships with men. (D.F. at 15.) The United States, on the other hand, presented testimony from Dr.

---

[5]     Plaintiff apparently believes that someone from Customs may have been disciplined as a result of this incident, and she therefore fears retaliation. (P.F. at 12.)

David Price, a forensic psychologist, that he believes Plaintiff does not have post-traumatic stress disorder because she does not exhibit the behaviors associated with that disorder. (D.F. at 15.) Notably, Plaintiff sought psychiatric treatment well prior to this 1997 incident at O'Hare; in 1993 and 1994, she received treatment from Dr. Dan O'Grady, whose records were reviewed by Dr. Price. (P.F. at 14; D.F. at 15.) Those records showed that Plaintiff complained of depression and inability to have healthy relationships in 1993 and 1994, long before the O'Hare search. (D.F. at 15.) Dr. Hefter, Plaintiff's witness, had not seen Dr. O'Grady's records when he testified that Plaintiff had post-traumatic stress disorder. (D.F. at 15.) After her brother's death in 1995, Plaintiff had also sought mental health treatment from another therapist, someone other than Dr. O'Grady. (D.F. at 15.) Dr. Price was unable to obtain the records of that treatment, nor did Plaintiff provide them to Dr. Hefter. (D.F. at 15.) With respect to Plaintiff's mental state following her brother's death in an airplane crash, Plaintiff explains: "[a]lthough [she] was greatly distressed over her brother's death in 1995, [she] could emotionally deal with his death because it was a natural occurrence and because she had said her good-byes to him." (P.F. at 14.)

Dr. Price testified that, on account of Plaintiff's lack of candor during his examination of her, he had reason to suspect that she had exaggerated her symptoms. (D.F. at 16.) For example, Plaintiff did not tell Dr. Price about a trip to Jamaica [6] she had taken after the search in question, and had denied her past usage of marijuana,

---

[6] It is not clear from the record when Plaintiff took this subsequent trip to Jamaica.

while, in fact, she had a substantial history of marijuana use.[7] (D.F. at 16.) Dr. Hefter concurred that Plaintiff's misrepresentation to Dr. Price about her marijuana use was significant as to her credibility. (D.F. at 16.) At the time he testified that Plaintiff suffered from post-traumatic stress disorder from her Customs search, Dr. Hefter was not aware that Plaintiff had returned through Customs alone since the 1997 search. (D.F. at 16.) Plaintiff testified at trial that she has traveled internationally several times since the 1997 search. (D.F. at 16.)

## DISCUSSION

O'Hare International Airport is a gateway into the United States, functionally equivalent to an international border. Arriving passengers are, therefore, subject to searches in the same category as searches at the border. *Saffell v. Crews*, 183 F.3d 655, 657 (7th Cir. 1999); *United States v. Johnson*, 991 F.2d 1287, 1290 (7th Cir. 1993). In conducting border searches, the government is entitled to "a little more leeway 'pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country.'" *Saffell*, 183 F.3d at 657, *quoting United States v. Ramsey*, 431 U.S. 606, 616 (1977). The expectation of privacy is less at the border than elsewhere, and "the Fourth Amendment balance between the

---

[7] Plaintiff sought to bar any testimony from Dr. Price concerning her history of marijuana use. The court concluded that Plaintiff's denial of such past use of marijuana might be relevant to her credibility and that its probative value outweighs any prejudice. In fact, Plaintiff's own testimony on the matter resulted in the disclosure at trial that Plaintiff had been in the presence of marijuana smoke on this very trip to Jamaica, a fact which might explain Shadow's alert. The Motion In Limine to Bar Certain Testimony of David R. Price (Doc. No. 84-1) is denied as moot.

interests of the Government and the privacy rights of the individual is also struck much more favorably to the Government at the border." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539-40 (1985).

Customs inspectors at the border may perform routine searches, such as searches of luggage and outer clothing in a reasonable manner, either on a completely random basis or on the basis of subjective suspicion. *Johnson*, 991 F.2d at 1291; 19 U.S.C. § 1582. Such routine searches, are considered "'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Ramsey*, 431 U.S. at 616. The Seventh Circuit has held that, to go beyond a routine search to a pat-down search at the border, the Customs inspector must have "some level of suspicion" that falls between "a certain quantum of suspicion [and] . . . no suspicion whatever." *United States v. Dorsey*, 641 F. 2d 1213, 1216, 1218 (7th Cir. 1981). To justify a more intrusive search, such as a body cavity or strip search of a border entrant, Customs inspectors must have "reasonable suspicion," which "requires a particularized and objective basis for suspecting the person is smuggling contraband." *Saffell*, 183 F.3d at 658-59.

Lawsuits brought under the FTCA are governed by the substantive law of the state where the alleged act or omission took place, in this case, Illinois. 28 U.S.C. § 1346(b).[8] The FTCA also provides that the "United States shall be liable, respecting

---

[8]     Notably, Plaintiff explicitly chose to proceed only on state law tort claims under the FTCA, rather than asserting violations of her constitutional rights. As explained below, FTCA claims in this case carry with them the burden of showing that
(continued...)

the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This court follows Judge Shadur's conclusion in *Estate of Warner v. United States*, 743 F. Supp. 551, 553 (N.D. Ill. 1990): "the 'private individual' to which the United States is analogized under Section 2674 is the corresponding public employer under Illinois law." The Ninth Circuit similarly explained in *Louie v. United States*, 776 F.2d 819 (9th Cir. 1985), that the "private individual under like circumstances" corresponding to an off-duty soldier was not the typical private individual. Its reasoning, applied by Judge Shadur in *Warner*, is likewise highly applicable here:

> Questions as to the power and authority to arrest, to maintain custody, and to lawfully restrict a person's liberty, are unique to the law enforcement function. Because private persons do not wield such police powers, the inquiry into the government's liability in this situation must include an examination of the liability of state and municipal entities "under like circumstances."

*Id.* at 825. Continuing with this logic, the Fifth Circuit recognized that the analogy to "private persons" requires courts to disregard state rules of sovereign immunity, but that, to adequately compare the Federal employee to a "private individual *under like circumstances*," courts should not "ignore a state's law enunciating negligence principles based on 'like circumstances' without regard to local sovereign immunity." *Crider v. United States*, 885 F.2d 294, 296-97 (5th Cir. 1989) (emphasis added).

Illinois law does speak to such principles. The Illinois Local Governmental and

---

[8](...continued)
the conduct at issue was willful and wanton.

Governmental Employees Tort Immunity Act ("Tort Immunity Act") provides that a public employee is not liable for acts or omissions "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS § 10/2-202; *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001). In light of the Ninth and Fifth Circuits', as well as Judge Shadur's, consideration of these issues, this court concludes that Plaintiff had to meet the higher standard of showing that the Customs inspectors' conduct was willful and wanton to prevail on her tort claims of false imprisonment and intentional infliction of emotional distress.[9]

In order to prove intentional infliction of emotional distress under Illinois law, in addition to willful and wanton conduct, Plaintiff had the burden to prove that: (1) Defendant's conduct was extreme and outrageous; (2) Defendant's conduct in fact caused Plaintiff to suffer severe emotional distress; and (3) that Defendant intended or knew that severe emotional distress was substantially certain to result from defendant's conduct. *Pavlik v. Kornhaber*, 260 Ill. Dec. 331, 761 N.E.2d 175, 186 (1st

---

[9] Although neither party cited it, the court is aware of one case where a court, faced with this same issue, reached a different result. In *Hyatt v. United States*, 968 F. Supp. 96, 107 (S.D.N.Y. 1997), a federal district court in New York applied Illinois law to plaintiff's FTCA claims against the United States for various torts allegedly committed by Drug Enforcement Agency officers. The *Hyatt* court declined to apply the willful and wanton standard from the Illinois Local Governmental and Governmental Employees Tort Immunity Act to the conduct of the federal officers because the "Second Circuit. . . has not adopted the approach of examining and applying the liability of state and municipal entities to the federal government's conduct 'under like circumstances.'" *Id.* This court, however, is not bound by the Second Circuit's position and, as previously mentioned, follows Judge Shadur's lead in adopting the Ninth and Fifth Circuits' reasoning.

Dist. 2001). For her false imprisonment claim, Plaintiff had to show, again that Defendant's conduct was willful and wanton, and that: (1) her "personal liberty was unreasonably or unlawfully restrained against her will" and (2) that Defendant "caused or procured the restraint." *Vincent v. Williams*, 279 Ill. App. 3d 1, 17, 664 N.E.2d 650, 654 (1st Dist. 1996). Thus, it is clear that if Defendant acted with reasonable suspicion, it cannot be held liable for either tort, as a finding of reasonable suspicion logically precludes a finding in Plaintiff's favor on the first element of both torts.

**Luggage Search**

A luggage search at the border is a routine search and requires no justification or suspicion whatsoever. *Montoya de Hernandez*, 473 U.S. at 537-38.

**Pat-Down Search**

Although many circuits find that a pat-down search at the border is as routine as a luggage search and therefore, requires no justification, the Seventh Circuit, as previously noted, requires that a Customs inspector have "some level of suspicion" that falls between "a certain quantum of suspicion [and] . . . no suspicion whatever." *Dorsey*, 641 F. 2d at 1218. Before performing a pat-down search of Plaintiff, Martinez knew that Officer Yates' drug detection dog, Shadow, had alerted to the presence of narcotics odor coming from Plaintiff; this fact alone probably elevates Martinez's level of suspicion sufficiently beyond "no suspicion whatsoever" to justify the pat-down. In any event, Martinez had more to go on than Shadow's alert. Martinez's interrogation of Plaintiff revealed several facts that aroused her suspicion, including, that Plaintiff, traveling alone over the holidays, stayed in a tent in someone's backyard, and that she

bought her plane ticket in cash on such short notice that she paid a premium for it. Whatever "degree of suspicion" is required to warrant a pat-down search, the court finds that Martinez certainly reached that level, and the subsequent pat-down was reasonable. *See Dorsey*, 641 F.2d at 1218.

## Strip Search

Nonroutine border searches, such as strip searches, are justified only by reasonable suspicion, defined as "'a particularized and objective basis for suspecting the particular person' of smuggling contraband." *Johnson*, 991 F.2d at 1291, *quoting Montoya de Hernandez*, 473 U.S. at 541. In the course of performing the pat-down search, Martinez reported feeling a lump or something thick in Plaintiff's crotch area. (P.F. at 8; D.F. at 11.) Plaintiff told Martinez that she was not menstruating or wearing a pad, and Martinez obtained approval from her supervisor to conduct a partial strip search of Plaintiff to determine what she had felt between Plaintiff's legs. (P.F. at 8; D.F. at 11.) The Seventh Circuit, in *Saffell*, found that the strip search at issue in that case, performed on the basis of a canine alert and a bulge in the passenger's clothing discovered during a pat-down search, was "fully justified." *Saffell*, 183 F.3d at 658. In light of the specific and objective facts known to the Customs inspectors about Plaintiff, (*i.e.*, the address she gave the airline was inconsistent with that listed on her driver's license, and heroin had been seized at her Chicago address the previous year), the circumstances of Plaintiff's travel (*i.e.*, the plane ticket for which she paid a premium, the facts that she traveled to a source country for narcotics

alone over the Christmas holidays, and camped by herself in a backyard) and the canine alert, the inspectors had reasonable suspicion to justify the strip search of Plaintiff.

The court notes its own skepticism concerning Martinez's testimony that she felt a bulge in Plaintiff's crotch area. Plaintiff offered the jeans that she was wearing during the pat-down search in evidence. The denim fabric was thin and worn and there was no unusual thickness or gathering of fabric between the legs. There was no testimony that Kaniff's anatomy was unusual in any way, and the court has no indication of what it was that Martinez could have felt. Nevertheless, the court is mindful of its obligation not to "indulge in 'unrealistic second-guessing,'" particularly because "'creative judge[s], engaged in *post hoc* evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.'" *Montoya de Hernandez*, 473 U.S. at 542, *quoting United States v. Sharpe*, 570 U.S. 675, 686 (1985). Moreover, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable." *Montoya de Hernandez*, 473 U.S. at 687, *citing Cady v. Dombrowski*, 413 U.S. 433, 447 (1973). Without more evidence to go on, the court would most certainly engage in the proscribed "unrealistic second-guessing" were it to discount completely Martinez's account of the strip search.

Other than the alleged sneer, Plaintiff identified no evidence of ill motive behind the search, no harsh words or otherwise suspicious conduct. Even assuming that Martinez overestimated any slight irregularity she felt during the pat-down search, or

even imagined it, the court notes the other facts Martinez was aware of while conducting the search: that a dog had alerted to Plaintiff, that she paid for her plane ticket in cash on short notice, that she had camped by herself in someone's backyard during a holiday vacation, and that drugs had been seized the previous year in the building where she lived. In light of these facts, the court concludes Plaintiff has not met her burden of showing that the Customs inspectors' conduct in performing the strip search was willful and wanton.

## X-Ray[10]

Neither the Supreme Court nor the Seventh Circuit has identified what level of suspicion is sufficient to justify an x-ray search of an incoming traveler crossing the international border. In his concurrence in *Montoya de Hernandez*, Justice Stevens stated that a "customs agent may require a nonpregnant person reasonably suspected of this kind of smuggling [to] submit to an x-ray examination as an incident to a border search." *Montoya de Hernandez*, 473 U.S. at 545. The Fifth, Eighth and Eleventh Circuits concur that a reasonable suspicion that a person is an alimentary canal smuggler may justify an involuntary x-ray examination. *See United States v. Oyekan*, 786 F.2d 832, 837 (8th Cir. 1986); *United States v. Vega-Barvo*, 729 F.2d 1341, 1348-49 (11th Cir. 1984); and *United States v. Mejia*, 720 F.2d 1378, 1381-82 (5th Cir. 1983).

---

[10] Plaintiff filed a Motion for Directed Verdict on the X-Ray (Doc. No. 95-1); this decision resolves all outstanding issues with respect to the x-ray, and the motion is, therefore, denied as moot. Plaintiff's Motion for a Finding that Probable Cause was Required for the Hospital Detention (Doc. No. 95-2) is also denied because of the court's finding of consent to the x-ray.

As the Second Circuit observed, such a holding is generally premised on the notion that "x-rays cause less embarrassment, indignity and invasion of privacy than . . . an ordinary strip search, which may be conducted on appropriate reasonable suspicion alone." *United States v. Reyes*, 821 F.2d 168, 171 (2nd Cir. 1987), *noting United States v. Mejia*, 720 F.2d 1378, 1382 (5th Cir. 1983).[11] This court need not decide what level of suspicion justifies an involuntary x-ray, nor whether there was reasonable suspicion for this x-ray, however, because the court concludes that Plaintiff consented to the x-ray. *See Reyes*, 821 F.2d at 171 (where consent to x-ray was validly given, the court need not reach question whether consent was necessary); *United States v. Gomez-Diaz*, 712 F.2d 949, 951 (5th Cir. 1983) (court did not reach question whether government had requisite degree of reasonable suspicion where consent to x-ray was given).

Although Plaintiff questions the validity of her consent to the x-ray, the court concludes she failed to prove that it was not knowing and voluntary. Plaintiff acknowledges that she was presented with three options after the strip search, and that one was to submit to an x-ray. (P.F. at 10). Plaintiff further acknowledged that she signed several forms while in custody, one of which meant that she would be taken

---

[11]     It appears that the Seventh Circuit has not considered whether an x-ray might in fact be less intrusive than a strip search. In light of the fact that the strip search provided officials with no additional evidence, the information that provided reasonable suspicion to justify the strip search must, in Defendant's view, also be sufficient to support an x-ray. This court therefore considers it possible that the less intrusive approach in cases like this would be to proceed to the x-ray without performing a strip search at all. Again, however, the court declines to engage in the proscribed "unrealistic second guessing" of the Customs officers' actions, especially where it does not appear that the standard practice is to forego a strip search in favor of an x-ray examination and Plaintiff herself has never argued for such an approach.

to the hospital for an x-ray examination. (D.F. at 25.) In support of her assertion that "[a]ny consent [she] may have given was not knowing and voluntary," Plaintiff asserts only that: while in custody of the Customs officials, she felt she could not leave; she was not told "she had a right to get a court order"; and she was not warned that she would have to remove her clothes and urinate in front of the female Customs inspectors during the pre-x-ray pregnancy test. (P.F. at 10-11). In this court's view, none of these matters vitiates Plaintiff's consent.

First, the fact that Customs officers did not tell Plaintiff she was free to leave does not affect the validity of her consent. *Cf. Ohio v. Robinette*, 519 U.S. 33 (1996) (the Fourth Amendment does not require police to advise a motorist stopped for speeding that he or she is "free to go" before the motorist's consent to search will be recognized as voluntary). Nor did Customs officers coerce Plaintiff by failing to tell her she had the "right to get a court order," *i.e.*, to demand a warrant. To the contrary, a truthful statement that Customs officers would seek a warrant if she declined consent would not vitiate Plaintiff's consent here, *see People v. Alvarado*, 268 Ill. App.3d 459, 468, 644 N.E.2d 783, 789 (4th Dist. 1994), but if Customs officers had told Plaintiff they would certainly obtain such a warrant, such a statement might well do so. *See State of Indiana v. Barker*, 739 N.E.2d 192 (Ct. App. Ind. 2000). Furthermore, to the extent Plaintiff might be concerned because she was not explicitly informed that she could refuse consent to the x-ray, the concern is misplaced: "ignorance of the right to refuse consent does not vitiate the voluntariness of the consent, but is merely one

factor to consider when examining the totality of the circumstances." *People v. Leon*, 311 Ill. App. 3d 624, 634, 723 N.E. 2d 1206, 1214 (1st Dist. 2000). In any event, Woods testified credibly that he did tell Plaintiff she had the right to refuse to consent to an x-ray; furthermore, Plaintiff herself testified, not that she was forced or coerced, but that she was given three options of how to proceed and that an x-ray at the hospital was an easy way to resolve the issue. Finally, whether Plaintiff knew that she would have to undergo a monitored pregnancy test does not change the fact that she agreed to an x-ray; this fact might be more relevant had Plaintiff attempted to revoke her consent when she learned she would have to urinate in the presence of the female Customs officers for the pregnancy test. The court finds that Plaintiff has not met her burden of proving that her consent to the x-ray procedure was invalid.

It also bears noting that Plaintiff made no showing here that the Customs inspectors behaved willfully and wantonly in taking her to have an x-ray, a prerequisite to prevailing on either of her tort theories. Under the Tort Immunity Act, willful and wanton conduct is defined as a "course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or a conscious disregard for the safety of others." 745 ILCS § 10/1-210. Plaintiff raised no allegation with respect to the x-ray examination, nor for that matter, with respect to any aspect of the detention and searches, that even arguably shows that the Customs inspectors intended to harm her or disregarded her safety. Furthermore, Plaintiff acknowledged under cross-examination that she believed she was searched by the Customs inspectors because they thought she was smuggling

narcotics internally.  If the Customs inspectors in fact had this belief, it would be nearly impossible to attribute any ill motive to their request that she submit to an x-ray.

## CONCLUSION

The court is sensitive to the concerns that moved the jurors who heard the evidence in this case.  No traveler would find such an invasive search pleasant, and in ideal circumstances no innocent traveler would be subjected to such invasive and humiliating inspection.  The fact that Customs inspectors were incorrect does not mean that their suspicion was unreasonable, however, or that their behavior was willful and wanton.  The court enters judgment in favor of Defendant.

ENTER:

Dated: March 8, 2002

REBECCA R. PALLMEYER
United States District Judge